IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JIMMY SUTTON                                              PLAINTIFF

V.                              NO. 10-5096

MICHAEL ASTRUE,
Commissioner of Social Security                          DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Jimmy Sutton, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for supplemental security income (SSI) under the provisions of Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.      Procedural Background:**

Plaintiff protectively filed his application for SSI on October 1, 2007, alleging an inability to work since May 26, 2007, due to bilateral hand osteoarthritis, bipolar affective disorder, lumbar spine degenerative disc disease, thoracic spine osteoarthritis, anxiety with panic attacks, depression, seizure disorder/black outs, and prostatitis.[1] (Tr. 182, 194). An administrative hearing was held on December 3, 2009, at which Plaintiff appeared with counsel and testified. (Tr. 34-68).

---

[1]Prostatitis - Inflammation of the prostate. Dorland's Illustrated Medical Dictionary 1553 (31st ed. 2007).

By written decision dated January 8, 2010, the ALJ found Plaintiff had the following severe impairments - degenerative disc disease of the lumbar and thoracic spine, rheumatoid arthritis, mild osteoarthritis of the hands, and a history of seizures.  (Tr. 14).  However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 16).  The ALJ found that Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 416.967(b) in that he can lift 20 pounds occasionally and 10 pounds frequently; can stand and/or walk about 6 hours out of an 8 hour workday, with normal breaks; can sit for about 6 hours out of an 8 hour workday, with normal breaks; and push and/or pull to same weights except the claimant can occasionally climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, or crawl; and must avoid concentrated exposure to extreme cold, humidity, vibration, and hazards such as unprotected heights and dangerous moving machinery.

(Tr. 17).  The ALJ found that Plaintiff could not return to his past relevant work as a brick layer, and determined that Social Security Ruling 85-15 supported a conclusion that Plaintiff's non-exertional impairments had only a minimal impact on the occupational job base, and did not significantly limit the number of available jobs.  (Tr. 20).  Therefore, he found that a finding of "not disabled" was appropriate under the framework of the Social Security Rules.  (Tr. 20).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on April 30, 2010.  (Tr. 1-3).  Subsequently, Plaintiff filed this action.  (Doc. 1).  Both parties have filed briefs and this case is before the undersigned for report and recommendation.  (Docs. 7, 8).

## II.   Evidence Presented:

Plaintiff was born in 1958 and received his GED.  (Tr. 182, 251).  He previously worked

-2-

as a brick layer. (Tr. 194). The records reflect that as early as January 6, 2000, Plaintiff suffered from and was treated for major depression and generalized anxiety disorder by Dr. Donald Clay at Ozark Guidance Center, Inc. (Tr. 247-250). On August 4, 2000, Plaintiff reported that he was still using amphetamines occasionally, and upon confrontation by Dr. Clay, agreed to make a full-faith effort to stop. At that time, he was assessed with major depression, generalized anxiety disorder, and amphetamine abuse. (Tr. 246). On December 6, 2000, Dr. Clay noted that Plaintiff cut down his Prozac on his own to 20 mg., and was doing better. (Tr. 245).

Plaintiff saw his treating physician, Dr. Norman Tubb, on December 7, 2000, complaining of joint pain, and was assessed with Epicondylitis,[2] lateral (similar to tennis elbow), and bipolar affective disorder (manic-depressive). (Tr. 382-383). He was given a steroid injection, but his elbow did not improve. (Tr. 380). On April 3, 2001, Dr. Tubb recommended they have an orthopedic surgeon examine his arm. (Tr. 359). There is no indication that this was ever done.

On April 27, 2001, Dr. Clay reported that Plaintiff said he went off his Prozac because it made him "go manic." Dr. Clay suspected illicit substance abuse was at the core of any behavior that appeared like that. (Tr. 243). On July 18, 2001, Plaintiff told Dr. Clay that he did not feel like the Xanax was helping anymore. (Tr. 242).

On August 27, 2001, Dr. Chambers, of Ozark Guidance Center, Inc., saw Plaintiff, who was complaining of continued chronic anxiety. (Tr. 240). Dr. Chambers gave his assessment as: Undiagnosed Affective Disorder with complaints of chronic anxiety; suspect social stresses;

---

[2]Epicondylitis - Inflammation of the epicondyle or of the tissues adjoining the epicondyle of the humerus. Id. at 637.

AO72A
(Rev. 8/82)

desire for monetary compensation; and possible effects from marijuana/amphetamine;  R/O generalized anxiety disorder. (Tr. 240). Dr. Chambers reported that he discussed with Plaintiff the fact that legitimate work would in fact relieve quite a bit of stress, to which Plaintiff responded that he was not able to do legitimate work because he had to take his daughter to class at 8:40 am and pick her up at 3:50 p.m. "Therefore, he has to resort to 'dealing drugs' to make a living." (Tr. 240).

On December 10, 2001, Plaintiff went back on Prozac, and said that he felt it was beginning to help. (Tr. 236). On February 11, 2002, Plaintiff reported to Dr. Clay that things were going "fairly well for him." (Tr. 235). Thereafter, Plaintiff began complaining of lumbar back pain.

On April 2, 2002, Plaintiff complained to Dr. Tubb of suffering with severe lumbar back pain for the past month. (Tr. 357). He was then assessed with low back pain and herpes simplex (genital) unspec. (Tr. 357).

On April 29, 2002, Dr. Clay reported that Plaintiff had been "variably compliant with his Prozac." (Tr. 234). However, Plaintiff had increased his Prozac to 40 mg. because he felt like he needed a "boost," and Dr. Clay cautioned Plaintiff "again against making medication changes without checking with me first." (Tr. 234). Plaintiff agreed to do so in the future, although Dr. Clay thought "he may have some chronic problems with compliance." (Tr. 234).

Plaintiff was reported as doing better between July 18, 2002, and December 2, 2002, and on January 20, 2003. (Tr. 231-233). Plaintiff only sought treatment from Dr. Clay one time in 2003. (Tr. 231). On June 4 and July 2, 2004, Plaintiff again saw Dr. Clay, who noted that Plaintiff was having some significant anxiety and increased depression. (Tr. 229-230).

-4-

However, on July 15, 2004, Dr. Clay reported that Plaintiff was less depressed, and that although he thought his memory was still poor, overall he was better. (Tr. 228).

On September 9, 2004, Dr. Norman Tubb reported that Plaintiff advised him he went to Ozark Guidance Center, Inc., and that they put him on weekly Prozac, but he could not afford it and it was not helping. (Tr. 342).

On December 21, 2004, Plaintiff complained to Dr. Tubb about joint pain, and advised Dr. Tubb that he abruptly stopped his Prozac in early November because it was not doing any good, and he wanted to discuss another medication he could take. At that time, Plaintiff was not taking any medications. (Tr. 336). He was complaining of pain and stiffness of the hands and wrists, and especially the left wrist, elbow and shoulder.

On March 24, 2005, Plaintiff was seen by licensed psychologist Alan Ramsey, of Healing the Family Center, Inc. (Tr. 251-253). In his report, Mr. Ramsey observed Plaintiff as having difficulty with ambulating and a fine tremor of the hands. (Tr. 251). Mr. Ramsey noted that Plaintiff was a bright individual, and displayed well above average intellectual performance on the mental status examination. Mr. Ramsey found that Plaintiff's ability to attend to a task did not appear to be impaired, and that he had adequate ability to sustain attention for an extended period of time. (Tr. 252). He stated that Plaintiff's mental control was problematic as he counted forward by three's from one to forty in fifteen seconds, making two errors, and that Plaintiff demonstrated excellent new learning ability. (Tr. 252). Mr. Ramsey found Plaintiff's remote memory was not impaired, his verbal fluency was within normal limits, and that intellectually, it appeared Plaintiff was functioning in the high average range as measured by his performance on tasks such as proverb interpretation, defining similarities and answering

-5-

questions requiring a fund of information.  (Tr. 252).  He also found Plaintiff's social judgment

skills were mildly impaired, as he could respond correctly to three of the five questions of social

judgment nature.  (Tr. 252).  Mr. Ramsey diagnosed Plaintiff with:

| | |
|---|---|
| Axis I: | Polysubstance Dependence - in remission |
| Axis II: | No diagnosis on Axis II |
| Axis III: | by client report - arthritis |
| Axis IV: | Economic Problems |
| | Problems related with access to health care |
| Axis V: | GAF - 44 (current). |

(Tr. 253).  Mr. Ramsey found that Plaintiff had a severe depressive disorder, but that it appeared

to be situational and related to his physical health issues and the economic inability to obtain

treatment for them.  (Tr. 253).  He was of the opinion that Plaintiff's depression would remit if

he could obtain effective treatment for his physical symptoms.  (Tr. 253).

On May 23, 2005, Russell J. Green, M.S., M.D., of St. John's WorkPartners, saw

Plaintiff to determine whether he met criteria to receive medical assistance or meet the definition

of an "individual requiring general relief."  (Tr. 256).  Dr. Green reported Plaintiff's depression

and bipolar disease, and noted that Plaintiff said that his previous treatment resulted in him

becoming more anxious.  He told Dr. Green that he was not taking any medication.  (Tr. 256).

Plaintiff advised Dr. Green that because of his combined problems, he had not worked for some

time although "when money runs short he will do some brick mason work to get by."  (Tr. 257).

Plaintiff was reported as smoking one pack of cigarettes per day, and averaged drinking 12 beers

per week.   (Tr. 257).   Plaintiff stated that he last used illicit substances, including

methamphetamine and marijuana, in April of 2003.  (Tr. 257).  Plaintiff told Dr. Green that he

had intermittent forms of income that he got "essentially under the table."  (Tr. 257).  He did not

do much at home except watch television. (Tr. 257). Plaintiff's range of motion in his neck was full in all planes, and there were no abnormalities to inspection of palpation of the upper extremities. (Tr. 258). There was no tremor present. Inspection of Plaintiff's lower extremities was unremarkable, as was his range of motion. (Tr. 258). The spinal exam revealed no specific abnormalities, and straight leg raises were negative, sitting and lying. Plaintiff was able to "heel and toe" without difficulty. Dr. Green diagnosed Plaintiff with:

1. Mental illness probably bipolar disease;
2. Multiplicity of musculoskeletal complaints without corroborating physical findings;
3. Lab was drawn for CBC, sedimentation rate and rheumatoid factor.

(Tr. 259). On May 26, 2005, Dr. Green reported that Plaintiff's lab work returned, showing a normal complete blood count, but a strongly positive rheumatoid factor. (Tr. 255). He stated that it was possible Plaintiff did have rheumatoid arthritis as a cause for the pain in his right hand, suggesting that he would benefit from review by a rheumatologist. (Tr. 255).

On June 17, 2005, Dr. Tubb wanted to get Plaintiff started on some medication for his rheumatoid arthritis and bipolar disease, and Plaintiff was prescribed Plaquenil, Naprosyn, Zyprexa, and Klonopin. (Tr. 335). On July 1, 2005, Plaintiff reported to Dr. Tubb that he did not feel the medication had helped him. He reported that the Plazuenil caused severe diarrhea, Klonopin caused over stimulation and sedation, and Zyprexa did not help at all. He took only one Plaquenil and did not try any more. (Tr. 333). Dr. Tubb advised that he would continue to manage Plaintiff's rheumatoid arthritis, but that Plaintiff would need to see a psychiatrist for the bipolar disorder. (Tr. 334).

In mid-August, 2005, Plaintiff presented to the emergency room after an apparent seizure. (Tr. 402). A catheterization with left ventriculography and coronary angiography revealed a

normal left ventriculogram and normal right-dominant coronary arteries.  (Tr. (Tr. 402-403).  At

the emergency room, it was noted that Plaintiff smoked one pack of cigarettes per day and had

done so for 30 years.  (Tr. 403).  He denied any drug use, but also tested positive for marijuana

in his system.  (Tr. 403).  When confronted about it, he said he smoked it intermittently, but

never had any trouble with it before.  (Tr. 403).  An August 22, 2005 report by Dr. Tubb reflected

that it was quite likely Plaintiff's seizure was caused by the Cymbalta he had begun taking.  (Tr.

333).  The Cymbalta was therefore discontinued, and he was to take Dilantin.  (Tr. 402).

On December 28, 2005, Plaintiff complained of lumbar strain, and a x-ray of his lumbar

spine revealed a normal study with minimal arthritic change, L5-S1 level, facets.  (Tr. 267).  A

MRI of the lumbar spine on January 11, 2006, revealed that the lumbar spine was normal in

sagitall alignment, the cauda and conus appeared normal and no intradural disease was present.

(Tr. 261).  The spinal column showed no active lesions or recent fractures.  The paraspinal

tissues were unremarkable.  (Tr. 261).  The impression was:

1. Moderate disc protrusion on the right at L4-5 compresses the right L5 nerve root.
2. Minimal disc disease is seen on the left at L5-S1 without appreciable impingement upon the left S1 nerve root at this time.
3. Mild facet arthritic changes are probably present at the lower two levels.

(Tr. 262).  In January and February of 2006, Plaintiff continued to complain of back pain, with

some improvement.  (Tr. 202, 205, 209, 310).

In a "Sickness Impact Profile - Lumbar Intake" report, Plaintiff reported that his health

was somewhat worse that one year prior;  that he had been in moderate pain during the previous

four weeks;  that pain prevented him from walking more than ½ mile;  that he could sit in his

favorite chair "as long as I like;"  that he could sleep well only by using medication;  that in the

last month, he had been able to walk over 2 blocks, but less than 2 miles, had taken walks outdoors or in malls for pleasure, but sometimes with pain; that his pain was on average moderate;  that the pain, numbing or tingling in his back or buttocks, legs or feet was mild; that there was no weakness in his legs or feet; and that he had no problems with his balance.  (Tr. 278-283).

A letter dated March 14, 2006, was written by Dr. Sami Khoshyomn, of the Spine Center - St. John's Regional Health Center, to Dr. Dushyant Verma.  (Tr. 288-289).  He reported that Plaintiff's pain in his back and right leg had subsequently improved to a point "where he does not have any pain at this point."  Plaintiff told Dr. Khoshyomn that he believed his back was out of alignment, but he denied any weakness, numbness, or paraesthesias in any of his limbs.  (Tr. 288).  His gait was reported as normal.  Dr. Khoshyomn's assessment was that the nature of the Plaintiff's pain syndrome was "probably mechanical diskogenic back pain due to degenerative disk disease within the lumbar spine," and that the etiology of the right leg pain likely was the small L4-5 disk herniation.  (Tr. 289).  He concluded:  "In light of the fact that patient's back pain has entirely resolved and his neck pain is on 2%-5% of his pain syndrome, I do not believe that any treatment is indicated at this point."  (Tr. 289).

On August 7, 2006, Dr. Norman Tubb reported that the chart indicated that Plaintiff should be taking Dilantin 100 mg. three times daily, but Plaintiff reported he was only taking it twice a day.  (Tr. 329).

On August 11, 2006, an ultrasound report revealed the following:

Left Lower Extremity Venous Duplex Study and Doppler Velocity Study
Impression:
        No evidence of thrombus formation in the left common femoral vein, superficial

-9-

femoral vein, or popliteal vein.  The saphenous vein also appear unremarkable.

(Tr. 292).  A radiology of Plaintiff's chest revealed:

> 1.  Moderate degenerative arthritic changes of the thoracic spine with lipping and decrease of the intervetebral disk space.
> 2.  No acute pulmonary process noted.

(Tr. 294).

On October 16, 2007, Plaintiff visited Dr. Alissa Hassan, of Tri-Lakes Internal Medicine and Rheumatology, upon referral by Dr. Tubb.  She reported that Plaintiff was not currently experiencing pain, but had experienced pain in the past two weeks.  (Tr. 432).  She reported that he smoked, lived with his daughter, did not work, had no history of alcohol misuses, and no drug misuses.  (Tr. 433).  Plaintiff saw Dr. Hassan two weeks later, on October 30, 2007, and it was noted that Plaintiff was not currently experiencing pain, but had experienced pain the previous two weeks.  Plaintiff reported that his joint pain and swelling at the hands was better with Prednisone 10 mg.  (Tr. 431).  She assessed Plaintiff with rheumatoid arthritis, and started Plaintiff on Methotrexate at 3 pills a week, then 5 pills, then 10 pills, and he was to continue Prednisone 10 mg.  He was also to add folic acid.  (Tr. 431).

On November 20, 2007, Plaintiff reported to Dr. Hassan that he was not currently experiencing pain, and had not experienced pain in the previous two weeks.  (Tr. 428).  Dr. Hassan noted that Plaintiff's rheumatoid arthritis improved on Prednisone 10 mg., and Methotrexate, 7 pills a week.  Plaintiff had no morning stiffness, joint pain, or swelling at that time.  She assessed Plaintiff with subjective and objective improvement in rheumatoid arthritis, fully controlled on Prednisone.  She advised him to cut down the Prednisone to 5 mg. and increase his Methotrexate to 10 pills.  (Tr. 429).

-10-

On January 2, 2008, a Physical RFC Assessment was completed by non-examining consultant, Carleen Ziehmer, Senior Counselor, Springfield Division Director for the Missouri Division of Vocational Rehabilitation. (Tr. 438-443). Ms. Ziehmer found that Plaintiff could: occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull (including operation of hand/foot controls) unlimited, other than shown for lift and/or carry. She also found that Plaintiff could frequently climb ramps/stairs and balance, and could occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl. No manipulative, visual or communicative limitations were established. Ms. Ziehmer further found that Plaintiff should avoid concentrated exposure to extreme cold, humidity, vibration, and hazards (machinery, heights, etc), and was unlimited in exposure to extreme heat, wetness, noise, and fumes, odors, dusts, gases, and poor ventilation. (Tr. 439-441). Ms. Ziehmer also gave a thorough analysis of Plaintiff's impairments and treatments as follows:

> The claimant has been diagnoses [sic] with RA, with treatment his condition has improved and is noted to be fully controlled. He is also taking Dilantin 300 mg 1 two daily for a history of a seizure disorder. His seizures appear to be controlled with current treatment. The claimant's physical impairments have shown improvement with continued treatment. His RFC is completed to take into consideration complaints of pain. His allegations are found to be partially credible.

(Tr. 442).

Also on January 2, 2008, a Psychiatric Review Technique form was completed by non-examining consultant, Kenneth Burstin, Ph.D. (Tr. 444-454). In the report, Dr. Burstin found that Plaintiff had mild restriction of activities of daily living; no limitations in maintaining social

-11-

functioning, concentration, persistence, or pace, and no episodes of decompensation, each of

extended duration. (Tr. 452). In his very thorough and informative notes, Dr. Burstin stated:

> The claimant alleges bipolar affective d/o and depression with an EOD of 5/26/07, the day following an ALJ denial decision.
>
> PCP Dr. Tubb - records document active problem - bipolar affective disorder - prescribed Prozac 20 mg daily but not taking. Claimant is taking Zyprexa 10 mg. He has also been prescribed psych medications from Dr. Clay at the Ozark Guidance Center; note indicates he is not taking these meds either.
>
> Ozark Guidance Center was contacted - they have no record of the claimant since 1/07.[3] (The attorney provided a psych evaluation from 2005. It stated the claimant was experiencing some depression that appeared to be situational and related to his physical health issues. He was noted not to meet the criteria for medical assistance due to a mental/emotional disorder).
>
> The claimant's PCP documents that he has a history of not taking his medications that were prescribed for his depression, which might or might not be a function of his MDI. The claimant has not followed up with the guidance center for at least a year. As noted in Dr. Tubb's MER, the claimant had been provided psych medications from Dr. Clay at the Ozark Guidance Center, but he was not taking them. The only medication that he is currently taking is Zyprexa, provided by his PCP. He has had no significant complaints about depression and/or has made no complaints to his PCP about depressive problems in the MER following the time of the OHA denial. It is suggested from this that his symptoms are controlled with current treatment with limited reports of problems currently, although his attorney-completed 3373 alleges adaptive limitations. However, even if his condition could be established to be greater than NS, and even if his non-compliance were established as directly secondary to his mental impairment, the fact remains that the MER does not suggest an acute exacerbation of the claimant's mental condition following the time of the OHA denial, and absent this, a disabling impairment of requisite duration cannot be established.

(Tr. 454).

On October 3, 2008, Plaintiff began seeing another rheumatologist, Dr. Anthony Tay,

as his previous rheumatologist had moved. (Tr. 492). Dr. Tay reported that at that time, Plaintiff

---

[3]The ALJ noted in his decision, and this Court confirms, that there is no record in the transcript of any treatment by Ozark Guidance Center in January of 2007 or thereafter.

mostly complained of pain in his back, which was continuous, achy and severe.  (Tr. 492).  Dr. Tay's impression was:

1.  History of rheumatoid arthritis.  This exam is completely benign today.  The patient is on high-dose methotrexate.
2.  History of chronic back pain.
3.  Smoking.
4.  Bipolar depression with panic and anxiety.
5.  History of seizures.

(Tr. 494).  A radiology report of Plaintiff's hands revealed juxta-articular demineralization. [4] Minor arthritic changes were noted, and bony proliferation of the right ulnar styloid process was found to possibly be related to the effects of old healed fracture.  "The result is the fact that there is probably limited right hand adduction secondary to the effects of the close proximity of the elongated ulnar styloid."  (Tr. 497).

On October 31, 2008, Plaintiff again saw Dr. Tay.  His peripheral joints were doing well and he had minimal pain and no swelling in the hands, although he had elevated inflammatory markers on his lab tests.  (Tr. 489).  Plaintiff also complained about the pain in his lower back and neck, which had been chronic.  Dr. Tay noted his bipolar disease with panic and anxiety attacks, and reported that Plaintiff smoked two packs of cigarettes per day and drank 12 beers a week.  (Tr. 490).  Dr. Tay reported that Plaintiff had:  normal flexion, extension and rotation of his neck;  his gait was normal;  he had normal muscle tone and muscle bulk;  there was no malalignment or subluxation of joints;  and no synovitis at proximal interphalangeals and metacarpophalangeals, wrists, elbows, knees or ankles.  (Tr. 490).  Dr. Tay noted that Plaintiff had somewhat impaired long and short term memory, but had normal affect.  Dr.Tay's

---

[4]Demineralization - Excessive elimination of mineral or inorganic salts, as in pulmonary tuberculosis, cancer, and osteomalacia.  Id. at 492.

impression at that time was:

> 1. Seropositive rheumatoid arthritis. The patient is on high-dose methotrexate. Swollen joint count 0.  Tender joint count 0.
> 2. History of chronic back pain.
> 3. Smoking.
> 4. Bipolar depression with panic and anxiety.
> 5. History of seizures.

(Tr. 490-491).

In a supplemental questionnaire dated November 15, 2007, Plaintiff reported that he could do laundry with help from his daughter;  make the bed/change the sheets, although he rarely changed them;  occasionally take out the trash;  do his banking;  rarely go to the post office; and that he had trouble staying asleep.  He reported that depression kept him from taking care of himself like he should.  (Tr. 204-205).  He stated that on an average day, he just watched television, because there was "nothing else to do."  (Tr. 205).  He stated he did not read because he had no desire to.  He played on-line "Spades" during the week, and was able to drive to appointments and check the mail.  (Tr. 206).  In an undated disability report, Plaintiff reported that his medication was keeping the pain level under control.  (Tr. 218).

At the December 3, 2009 hearing, the ALJ carefully discussed with Plaintiff's attorney the lack of objective evidence supporting the alleged mental impairment under listing 12.04.  (Tr 38).  The ALJ also advised Plaintiff that there was not much evidence that he worked very much over the last 30 years.  (Tr. 45).  The ALJ further stated:

> One of my functions is to determine whether or not a person's motivated to work and even though they're motivated to work they can't because they're disabled.  Now, motivation plays such a big role in determining whether you're disabled.  If you're not motivated to work then a hang nail would prevent you from working, whereas if you're motivated to work then you could be like my secretary, who's paralyzed from the waist down and is in a wheelchair.  She has difficulty moving her upper extremities but she's

-14-

so motivated to work that she's overcome that.  So motivation is a huge factor and that's why these SSI cases are so difficult, because the records reflect that you haven't worked for (inaudible).

(Tr. 45).   In response, Plaintiff stated that he worked full-time from the time he was 16 until 1996, and that 1996 was when he first started having "real bad" problems with depression, and that is when he quit working for the Springdale schools. (Tr. 45).  When the ALJ asked Plaintiff what the biggest obstacle was that limited him from returning to work, Plaintiff stated that it was the depression and panic attacks.  (Tr. 46).  Plaintiff stated that he saw Dr. Clay at Ozark Guidance Center, Inc. in 2002, and that his treating physician, Dr. Tubb, put him on Zyprexa. (Tr. 47).  He further stated that his condition had not improved, and that he saw another doctor who put him on Cymbalta, and was taken off of that when he had a seizure.  (Tr. 47).  He said he thereafter saw a psychologist, but could not remember his name, and that he "just didn't really have the money to go see any other doctors." (Tr. 47).  The ALJ then advised Plaintiff that most areas have either a free mental health clinic or one that is based on a sliding scale based upon one's income, and that it was not a very good excuse if Plaintiff wanted to get treated by a mental health professional, to not try because of a lack of funds.  (Tr. 48).

The Court also notes that the ALJ expressed his displeasure with Plaintiff's counsel when he discovered that he did not have the most recent medical records from Dr. Tubb.  Upon inquiring further from Plaintiff's counsel as to the reasons why she had not followed-up with Plaintiff's doctors prior to the hearing, the ALJ admonished Plaintiff's attorney at length, advising her that the case was not ready to go to hearing, and that she was taking time that could have been given to someone else that could be losing their home, or someone who was three months away from dying.  (Tr. 51-55).  The ALJ then proceeded to take additional testimony

-15-

regarding the existence and substance of medical records in 2008 and 2009, as well as Plaintiff's capabilities. When the ALJ realized that all he was missing were two chart notes from Dr. Tubb since July 15, 2008, and Dr. Tay, Plaintiff's rheumatologist, the ALJ questioned Plaintiff further, and Plaintiff acknowledged that his hands and wrists were pretty well controlled on Methotrexate, with minimal pain and no swelling. Plaintiff also acknowledged that his back pain was pretty well controlled with medication, although it hurt a little bit, and that Dr. Tay's records and Dr. Tubb's records would reflect such.

Plaintiff testified that his depression and anxiety were his primary problems, although he also stated that he had not seen Dr. Clay in the past couple of years because he had been in Missouri. (Tr. 61). The ALJ responded: "The problem with the depression and anxiety is that you don't have any medical record in the last three to four years that would support that claim. That is why Dr. Burstin with the State of Missouri DDS found that his mental condition was non-severe as of January of 08." (Tr. 61). Although the Plaintiff told the ALJ that he had panic attacks at least once a week, the ALJ stated that he did not have any medical records documenting such. (Tr. 62). This testimony led the ALJ to conclude that he was not going to keep the record open for the additional records because they related only to Plaintiff's treatment of his physical complaints, which were relatively well controlled. The ALJ then advised Plaintiff that he was going to "go back and write a decision denying benefit[s]," which would establish a res judicata effect. The ALJ gave Plaintiff and his counsel the opportunity for them to withdraw the claim and have Plaintiff file a new claim, thereby allowing him to have time to establish a basis for his claim and see some mental health professionals. (Tr. 63-64). The ALJ then further admonished the Plaintiff's counsel as follows:

-16-

ALJ: You, you've got to really get more actively involved in your cases and help these people...who are unable to help themselves if you want to continue to represent them and, and add value to the case.

ATTY: Yes, Your Honor.

ALJ: So what is it going to be?  Do you want me to go ahead and adjudicate this case and hope for the best?  Or, or do you, do you want to withdraw the claim and – so he could file a new claim and, and start getting some treatment to establish a, a record to support a claim?

(Tr. 63-65).  After Plaintiff's counsel conferred with her client, she advised the ALJ that they would like the ALJ to adjudicate the claim.

The Court notes it agrees with the ALJ to the extent that it was apparent that Plaintiff's counsel was ill-prepared for the hearing in this matter.  Plaintiff's counsel would be well advised to heed the ALJ's admonishments and advice in all future cases.

At the hearing, Plaintiff also stated that he had not touched any drugs in almost two years, and before that, he used methamphetamine and marijuana.  (Tr. 65).  He stated that he quit methamphetamine about four years ago because it was killing him, and that he took it for about 5 years every day.  (Tr. 66).  He also used marijuana every day for about 30 years, and had three beers about two weeks ago.  (Tr. 66).  Finally, Plaintiff testified that he could work part-time if he could make it to the job and that on the date of the hearing, he did not feel like he could.  (Tr. 67).  He stated that he had not done any volunteer work in the last couple of years, and that he just did not know what to do - he just did not like getting out of the house.  (Tr. 67).

**III.    Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind

-17-

would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled

-18-

an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC).  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**IV.   Discussion:**

**A.   Impairments**

The ALJ found that Plaintiff had the following severe impairments - degenerative disk disease of the lumbar and thoracic spines; rheumatoid arthritis; mild osteoarthritis of the hands; and a history of seizures.  (Tr. 14).  He also found that Plaintiff's medically determinable mental impairment of bipolar disorder with depression and anxiety did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities, and was therefore non-severe.  "An ALJ may deny benefits at step two of the sequential evaluation only if a claimant's medical impairments are so slight that it is unlikely he or she would be found to be disabled even if their age, education, and experience were taken into account."  Bowen v. Yuckert, 482 U.S. 137, 153 (1987).  "A majority of the Supreme Court has adopted what has been referred to as a 'de minimis standard' with regard to the step two severity standard."  Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989); Funderburg v. Bowen, 666 F.Supp. 1291 (W.D. Ark. 1987). "Only those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking the vocational analysis."  Yuckert, 482 U.S. at 158.

-19-

The ALJ properly noted that Plaintiff had only sporadically sought mental health treatment, with the last formal treatment occurring in 2004. (Tr. 14). He further correctly found that Plaintiff had received medication for his mental impairment from his primary care physician, although Plaintiff was at times non-compliant. In his Psychiatric Review Technique form, Dr. Kenneth Burstin thoroughly discussed Plaintiff's non-compliance with medications in his notes, indicating that Dr. Tubb prescribed Prozac 20 mg. daily but Plaintiff was not taking it, and that he had also been prescribed medications from Dr. Clay at Ozark Guidance Center, Inc., but that the notes indicated he was not taking those medications either. Dr. Burstin also noted that Ozark Guidance Center, Inc. had no record of Plaintiff since January of 2007. (See fn. 3). Further, in 2005, a psychological report was completed by Alan Ramsey, a licensed psychologist, who diagnosed Plaintiff with polysubstance dependence in remission, major depressive disorder, recurrent-severe, and opined that Plaintiff's depressive disorder appeared to be situational and related to his physical health issues and economic inability to obtain treatment for them, and that the depression would remit if Plaintiff obtained effective treatment for his physical symptoms. (Tr. 253).

Plaintiff argues that the ALJ should have sought an opinion from Plaintiff's treating physicians, or in the alternative, ordered a consultative examination to assess his mental RFC, and that he failed to fully and fairly develop the record by failing to do so. There is no question that the ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995); Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000). This can be done by re-contacting medical sources and by ordering additional consultative examinations, if necessary. See 20 C.F.R. § 404.1512. The ALJ's duty to fully and fairly develop the record is independent

-20-

of Plaintiff's burden to press his case.  Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010).

The proper inquiry is whether the record contained sufficient evidence for the ALJ to make an

informed decision.  Payton v. Shalala, 25 F.3d 684, 686 (8th Cir. 1994); Matthews v. Bowen, 879

F.2d 422, 424 (8th Cir. 1989).[5]

In the present case, the ALJ had before him sufficient evidence to make an informed

decision.  He had the treatment records of Plaintiff's treating physician, Dr. Tubb, who continued

to treat Plaintiff for his alleged mental impairments.  There is no record of Plaintiff seeking

treatment from a mental health professional after July 2004, and no record of any physician

during the relevant time period restricting Plaintiff's functioning due to a mental impairment.

In addition, the ALJ had before him the Psychiatric Review Technique form completed by Dr.

Kenneth Burstin, who noted that the only medication Plaintiff was taking was Zyprexa, provided

by his primary care physician, and that Plaintiff had no significant complaints about depression

and/or had made no complaints to his primary care physician about depressive problems

following the time of the OHA (office of hearings and appeals) denial.  Dr. Burstin also noted

that even if Plaintiff's condition was greater than non-severe, and even if his non-compliance

were established as directly secondary to his mental impairment, "the fact remains that the MER

does not suggest an acute exacerbation of the claimant's mental condition following the time of

the OHA denial, and absent this, a disabling impairment of requisite duration cannot be

established."

There is nothing in the record to indicate that Plaintiff had anything but a mild limitation

---

[5]The Court further refers to its previous discussion relating to the ALJ giving Plaintiff the opportunity to
withdraw his claim and seek psychological treatment and to file a new claim, with treatment records that perhaps
could support his claim, and Plaintiff chose not to do so.

in activities of daily living, and based upon the foregoing, the Court believes there is substantial evidence to support the ALJ's finding that Plaintiff's mental impairments were non-severe.

**B.      Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints, including evidence presented by third parties, that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In the present case, the ALJ carefully pointed out the inconsistent statements Plaintiff made regarding matters relevant to the issue of disability:

> The claimant testified he last worked as a bricklayer in 2003 or 2004; yet medical records from October 2008 indicate the claimant reported he had not worked for the last year or so (Exhibit 14F, p.2). The claimant testified that his depression became so bad he was no longer able to work in approximately 1996; yet the record shows the claimant had earnings of more than $3700 in 2004 (Exhibit 5D). The claimant reported "disabling" back pain and joint pain from rheumatoid arthritis, yet testified that his pain and limitations are well controlled by medication and only his mental impairments "disable" him. The claimant testified at hearing to experiencing weekly panic attacks; however there is nothing in the record to support any panic attacks, let alone with that frequency alleged....I find that although he has medically determinable severe impairments, these impairments do not cause the degree of limitations alleged by the claimant. When evaluated, the claimant's subjective complaints are found to be exaggerated and inconsistent with the other evidence, including the clinical and objective findings of

-22-

record and are not a sound basis for decision-making.

(Tr. 19).

The Court further notes that Plaintiff advised Dr. Green that he last used methamphetamine and marijuana in April of 2003. However, when Plaintiff presented himself to the emergency room in August of 2005, he tested positive for marijuana, and when confronted, said he smoked it intermittently. Based upon the foregoing, the Court believes there is substantial evidence to support the ALJ's conclusion that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms and allegations of disability were not credible.

## C.    RFC Assessment:

The Court next addresses the ALJ's assessment of Plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

-23-

In the present case, the ALJ found that Plaintiff had the RFC to perform light work, with certain limitations. Plaintiff testified that his back pain was "pretty much" well controlled by pain medication. Dr. Hassan opined that Plaintiff's moderately severe rheumatoid arthritis was fully controlled by medication, and Plaintiff testified that the symptoms of his rheumatoid arthritis were also controlled by medication. Further, it appears that the last seizure Plaintiff had was in November of 2005, and that Dilantin appears to control his seizures.

The Court believes the ALJ's RFC finding that Plaintiff could perform light work with certain limitations fully sets forth Plaintiff's ability to function in the workplace, and that there is substantial evidence to support the ALJ's RFC findings.

The Court also finds that the ALJ appropriately relied upon the Grids in this case to conclude that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. Once Plaintiff has established a prima facie case by showing an inability to perform past relevant work, the burden of proof shifts to the Commissioner to show that Plaintiff has the RFC to perform some other kind of work and that jobs are available in the national economy which realistically fit his capabilities. Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993). If the Plaintiff is found to have only exertional impairments (affecting the ability to perform physical labor), the Commissioner may meet this burden by referring to the Grids which are fact-based generalizations about the availability of jobs for people of varying ages, educational background, and previous work experience, with differing degrees of exertional impairments. See 20 C.F.R. Part 404, Subpart P, Appendix 2; Foreman v. Callahan, 122 F.3d 24, 26 (8th Cir. 1997); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992) (citations omitted). "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment

-24-

if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the Plaintiff's RFC to perform the full range of activities listed in the Guidelines." Thompson v. Astrue, No. 06-1081, 2007 WL 601596, at *3 (8th Cir. Feb. 28, 2007), quoting Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997).

In the present case, the ALJ found that Plaintiff's non-exertional impairments had only a minimal impact on the occupational job base and did not significantly limit the number of available jobs. Based upon the foregoing discussion, the Court finds substantial evidence to support this finding, and it was therefore appropriate for the ALJ to apply the Grids.

**V. Conclusion:**

Based on the foregoing, the Court recommends that the ALJ's decision be affirmed and the Plaintiff's case be dismissed with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of July, 2011.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)